**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
         lrosen@rosenlegal.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| RAJANI CHITTURI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KINGOLD JEWELRY, INC., ZHIHONG JIA, and BIN LIU,<br><br>Defendants. | Case No:<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Plaintiff Rajani Chitturi ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Kingold Jewelry, Inc. ("Kingold" or the "Company"), and information readily obtainable on the Internet. Plaintiff

believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Kingold securities between March 15, 2018 and June 28, 2020, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Kingold securities during the Class Period and was economically damaged thereby.

7. Defendant Kingold purports to design, manufacture, and sell 24-karat gold jewelry and Chinese ornaments in the People's Republic of China. Kingold is incorporated in Delaware with headquarters in Wuhan, PRC. Kingold's securities trade on NASDAQ under the ticker symbol "KGJI."

8. Defendant Zhihong Jia ("Jia") served as the Company's Chief Executive Officer ("CEO") throughout the Class Period.

9. Defendant Bin Liu ("Liu") served as the Company's Chief Financial Officer ("CFO") from April 2010 until June 1, 2020.

10. Defendants Jia and Liu are collectively referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

    (a) directly participated in the management of the Company;

    (b) was directly involved in the day-to-day operations of the Company at the highest levels;

    (c) was privy to confidential proprietary information concerning the Company and its business and operations;

    (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12. Kingold is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Kingold under *respondeat superior* and agency principles.

14. Defendants Kingold and the Individual Defendants are collectively referred to herein as "Defendants."

**SUBSTANTIVE ALLEGATIONS**
**Materially False and Misleading**
**Statements Issued During the Class Period**

15. On March 15, 2018, the Company filed its annual report on Form 10-K for the year ended December 31, 2017 with the SEC (the "2017 10-K"). The 2017 10-K was signed by Defendants Jia and Liu. The 2017 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Jia and Liu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

16. The 2017 10-K stated the following concerning the Company's investments in gold:

> We pledged the gold leased from related party and part of our own gold inventory to meet the requirements of bank loans. The pledged gold will be available for sale upon the repayment of the bank loans. We classified these pledged gold as

investments in gold, and carried at fair market value, with the unrealized gains and losses, included in the determination of comprehensive income and reported in shareholders' equity. The fair market value of the investments in gold is determined by quoted market prices at Shanghai Gold Exchange. Since the investments in gold are pledged for the bank loans, any material decrease in market value may negatively impact the loan covenants.

\* \* \*

The Company also allocated significant portion of its inventories as investment in gold and pledged as collateral to secure loans from banks and financial institutions, so there is a risk that the Company is unable to utilize its inventories, and there could be a disruption in the Company's supply of gold which could decrease its production and shipping levels. In addition, the investment in gold may be deficient if the fair market value of the pledged gold in connection with the loans declines, then the Company may need to increase the pledged gold inventory for the loan collateral or increase restricted cash.

17. The 2017 10-K stated the following concerning the Company's loans payable to Chang'An Trust:

In September 2017, Wuhan Kingold entered into a new Trust Loan Contract with Chang'An Trust. The agreement allows the Company to access a total of approximately $153.7 million (RMB 1 billion) for the purpose of working capital needs. The loan bears a fixed annual interest of 10% with a term of 24 months and is secured by 4,784 kilograms of Au9999 gold in aggregate with carrying value of approximately $172.7 million (RMB 1.1 billion). The loan is also guaranteed by the CEO and Chairman of the Company. As of December 31, 2017, the Company received full amount from the loan. The Company also made a restricted deposit of approximately $1.5 million (RMB 10 million) to secure these loans. The deposit will be refunded when the loan is repaid upon maturity.

The Company paid approximately $1.7 million (RMB 11.0 million) as loan origination fee for obtaining the new loan. The loan origination fee was recorded as deferred financing cost against the loan balance. For the year ended December 31, 2017, approximately $0.1 million (RMB 0.8 million) deferred financing cost was amortized. As of December 31, 2017, the unamortized deferred financing cost related to obtaining this loan was approximately $1.6 million (RMB 10.2 million).

18. On April 2, 2019, the Company filed its annual report on Form 10-K for the year ended December 31, 2018 with the SEC (the "2018 10-K"). The 2018 10-K was signed by Defendants

5

Jia and Liu. The 2018 10-K contained signed SOX certifications by Defendants Jia and Liu attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19. The 2018 10-K explained that the Company obtained and secured loans using gold:

> The Company also allocated significant portion of its inventories as investment in gold and pledged as collateral to secure loans from banks and financial institutions, so there is a risk that the Company is unable to utilize its inventories, and there could be a disruption in the Company's supply of gold which could decrease its production and shipping levels. In addition, the investment in gold may be deficient if the fair market value of the pledged gold in connection with the loans declines, then the Company may need to increase the pledged gold inventory for the loan collateral or increase restricted cash.

20. The 2018 10-K stated the following concerning the Company's loans payable to Dongguan Trust:

> In July 2018, Wuhan Kingold entered into a gold income rights transfer and repurchase agreement (the "Agreement") with Dongguan Trust. The Agreement allows the Company to obtain no more than approximately $145.4 million (RMB 1 billion) to exchange the income earning rights of the Company. The Company committed to buy back the rights and repay the proceeds received, and shall pay a fixed interest of 11% over a term of 18 months. The Company determined that this Agreement is essentially a loan agreement due to the nature of this transaction. This loan is secured by 4,974 kilograms of Au9999 gold in aggregate with carrying value of approximately $165.8 million (RMB 1,140 million). The loan is also guaranteed by the CEO and Chairman of the Company. The Company also made a restricted deposit of approximately $1.5 million (RMB 10 million) to secure the loan. The deposit will be refunded when the loan is repaid upon maturity.
>
> The Company paid approximately $2.2 million (RMB 15 million) as loan origination fee for obtaining this loan. The loan origination fee was recorded as deferred financing cost against the loan balance. For year ended December 31, 2018, approximately $0.6 million (RMB 3.9 million) deferred financing cost was amortized.

21. The 2018 10-K stated the following concerning the Company's loan's payable to Minsheng Trust:

On October 10, 2018, the Company entered into a Trust Loan Contract in the amount of no more than approximately $145.4 million (RMB 1.0 billion) with China Minsheng Trust Co., Ltd. ("Minsheng Trust"). The purpose of the trust loan is to supplement liquidity needs. The Trust Loan will be issued in installments. Each installment of the Trust Loan has a 12-month term, and the period from issuance date of the first installment to the expiration date of the last installment shall not exceed 18 months. The Trust Loan bears interest at a fixed annual rate of 10.5%. The loan is secured by 5,356 kilograms of Au9999 gold in aggregate with carrying value of approximately $181.9 million (RMB 1.3 billion). The loan is also guaranteed by the CEO and Chairman of the Company. As of December 31, 2018, the Company received the full amount from the loan.

22. The 2018 10-K stated the following concerning the Company's loans payable to Chang'An Trust:

In September 2017, Wuhan Kingold entered into a new Trust Loan Contract with Chang'An Trust. The agreement allows the Company to access a total of approximately $145.4 million (RMB 1 billion) for the purpose of working capital needs. The loan bears a fixed annual interest of 10% with a term of 24 months and is secured by 4,784 kilograms of Au9999 gold in aggregate with carrying value of approximately $163.4 million (RMB 1.1 billion). The loan is also guaranteed by the CEO and Chairman of the Company. As of December 31, 2018, the Company received full amount from the loan. The Company also made a restricted deposit of approximately $1.5 million (RMB 10 million) to secure these loans. The deposit will be refunded when the loan is repaid upon maturity. On September 30, 2018, the Company made repayment of approximately $2.9 million (RMB 20 million). On October 31, 2018, the Company made additional repayment of approximately $25.9 million (RMB 178.2 million) to Chang'An Trust. As of December 31, 2018, the balance of loans from Chang'An Trust was approximately $116.6 (RMB 801.9 million).

The Company paid approximately $1.5 million (RMB 11 million) as loan origination fee for obtaining the loans. The loan origination fee was recorded as deferred financing cost against the loan balance. For the years ended December 31, 2018 and 2017, approximately $0.8 million (RMB 5.5 million) and $0.1 million (RMB 0.8 million) deferred financing costs were amortized, respectively.

Interest expenses for all of the short term loans classified as of the balance sheet dates for the years ended December 31, 2018 and 2017 were approximately $116.1 million and $68.8 million, respectively. The weighted average interest rates for the years ended December 31, 2018 and 2017 were 9.0% and 7.0%, respectively.

23. The statements contained in ¶15-22 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Kingold used fake gold as collateral to fraudulently secure loans; (2) consequently, the Company would face creditor lawsuits and be delisted from the Shanghai Gold Exchange; and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH EMERGES

24. On June 29, 2020, before the market opened, *Caixin Global* published an article entitled "Cover Story: The Mystery of $2 Billion of Loans Backed by Fake Gold." The article stated, among other things, that Kingold had used gold bars that were actually gilded copper as collateral in loans and was now facing lawsuits as a result, and that Kingold had been delisted from the Shanhai Gold Exchange. The article provided, in relevant part:

> More than a dozen Chinese financial institutions, mainly trust companies, loaned 20 billion yuan ($2.8 billion) over the past five years to Wuhan Kingold Jewelry Inc. with pure gold as collateral and insurance policies to cover any losses.
>
> Kingold is the largest privately owned gold processor in central China's Hubei province. Its shares are listed on the Nasdaq stock exchange in New York. The company is led by Chairman Jia Zhihong, an intimidating ex-military man who is the controlling shareholder.
>
> What could go wrong?
>
> ***Well, plenty, as at least some of 83 tons of gold bars used as collateral turned out to be nothing but gilded copper. That has left lenders holding the bag for the remaining 16 billion yuan of loans outstanding against the bogus bars. The loans were covered by 30 billion yuan of property insurance policies issued by***

*state insurer PICC Property and Casualty Co. Ltd. (PICC P&C) and other smaller insurers.*

The fake gold came to light in February when Dongguan Trust Co. Ltd. set out to liquidate Kingold collateral to cover defaulted debts. In late 2019 Kingold failed to repay investors in several trust products. Dongguan Trust said it discovered that the gleaming gold bars were actually gilded copper alloy.

The news sent shock waves through Kingold's creditors. China Minsheng Trust Co. Ltd., one of Kingold's largest creditors, obtained a court order to test collateral before Kingold's debts came due. On May 22, the test result returned saying the bars sealed in Minsheng Trust's coffers are also copper alloy.

Authorities are investigating how this happened. Kingold chief Jia flatly denies that anything is wrong with the collateral his company put up.

The case holds echoes of China's largest gold-loan fraud case, unfolding since 2016 in the northwest Shaanxi province and neighboring Hunan. Regulators found adulterated gold bars in 19 lenders' coffers backing 19 billion yuan of loans. In one case, a lender seeking to melt gold collateral found black tungsten plate in the middle of the bars.

In the case of Kingold, the company said it took out loans against gold to supplement its cash holdings, support business operations and expand gold reserves, according to public records.

In 2018, the company beat a number of competitors bidding to buy a controlling stake in state-owned auto parts maker Tri-Ring Group. Kingold offered 7 billion yuan in cash for 99.97% of Tri-Ring. The Hubei government cited the deal as a model of so-called mixed-ownership reform, which seeks to invite private shareholders into state-owned enterprises. But Kingold has faced problems taking over Tri-Ring's assets amid a series of corruption probes and disputes involving Tri-Ring.

After obtaining the test results, Minsheng Trust executive said the company asked Jia whether the company fabricated the gold bars.

"He flatly denied it and said it was because some of the gold the company acquired in early days had low purity," the executive said.

In a telephone interview with Caixin in early June, Jia denied that the gold pledged by his company was faked.

"How could it be fake if insurance companies agreed to cover it?" he said and refused to comment further.

*As of early June, Minsheng Trust, Dongguan Trust and a smaller creditor Chang'An Trust filed lawsuits against Kingold and demanded that PICC P&C cover their losses.* PICC P&C declined to comment to Caixin on the matter but said the case is in judicial procedure.

A source from PICC P&C told Caixin that the claim procedure should be initiated by Kingold as the insured party rather than financial institutions as beneficiaries. Kingold hasn't made a claim, the source said.

*Caixin learned that the Hubei provincial government set up a special task force to oversee the matter and that the public security department launched an investigation. The Shanghai Gold Exchange, a gold industry self-regulatory organization, disqualified Kingold as a member on June 24.*

**All that glitters is not gold**

*Following Dongguan Trust and Minsheng Trust, two other Kingold creditors also tested pledged gold bars and found they were fake, Caixin learned.*

A Dongguan Trust employee said his company reported the case to police on Feb. 27, the day after the testing result was delivered, and demanded 1.3 billion yuan of compensation from PICC P&C's Hubei branch. Kingold has defaulted on 1.8 billion yuan of loans from Dongguan Trust with an additional 1.6 billion yuan due in July.

The 83 tons of purportedly pure gold stored in creditors' coffers by Kingold as of June, backing the 16 billion yuan of loans, would be equivalent to 22% of China's annual gold production and 4.2% of the state gold reserve as of 2019.

Founded in 2002 by Jia, Kingold was previously a gold factory in Hubei affiliated with the People's Bank of China that was split off from the central bank during a restructuring. With businesses ranging from gold jewelry design, manufacturing and trading, Kingold is one of China's largest gold jewelry manufacturers, according to the company website.

The company debuted on Nasdaq in 2010. The stock currently trades around $1 apiece, giving Kingold a market value of $12 million, down 70% from a year ago. A company financial report showed that Kingold had $3.3 billion of total assets as of the end of September 2019, with liabilities of $2.4 billion.

*          *          *

Several trust company sources said Jia is well connected in Hubei, which may explain Kingold's surprise victory in the Tri-Ring deal. But a financial industry source in Hubei said Jia's business is not as solid as it may appear.

*"We knew for years that he doesn't have much gold -- all he has is copper," said the source, who declined to be named.*

Local financial institutions in Hubei have avoided doing business with Kingold, but they don't want to offend him publicly, the source said.

"Almost none of Hubei's local trust companies and banks has been involved in (Kingold's) financing," he said.

Public records showed that most of Kingold's creditors are from outside Hubei. Caixin learned from regulatory sources that Minsheng Trust is the largest creditor of Kingold with nearly 4.1 billion yuan of outstanding loans, followed by Hengfeng Bank's 3.9 billion yuan, Dongguan Trust's 3.4 billion yuan, Anxin Trust & Investment Co.'s 1.9 billion yuan and Sichuan Trust Co.'s 1.8 billion yuan.

Several industry sources told Caixin that the institutions were willing to offer loans to Kingold because Jia promised to help them dispose of bad loans.

Hengfeng Bank is the only commercial bank involved in the Kingold affair. The bank in 2017 provided an 8 billion yuan loan to Kingold, which in return agreed to help the bank write off 500 million yuan of bad loans, bank sources said. Kingold repaid half of the debts in 2018.

But the loan issuance involved many irregularities as access to the pledged gold and testing procedures was controlled by Kingold, one Hengfeng employee said.

The loan was pushed forward by Song Hao, former head of Hengfeng's Yantai branch. Song was placed under graft investigation in March 2018 in connection with the bank's disgraced former Chairman Cai Guohua, whose downfall led to a major revamp in the bank's management. *In 2019, Hengfeng's new management sued Kingold for the unpaid loans and moved to dispose the collateral. But a test of the gold bars found they are "all copper," the bank source said.*

It is still unclear whether the collateral was faked in the first place or replaced afterward. Sources from Minsheng Trust and Dongguan Trust confirmed that the collateral was examined by third-party testing institutions and strictly monitored by representatives from Kingold, lenders and insurers during the process of delivery.

"I still can't understand which part went wrong," a Minsheng Trust source said. Bank records showed that the vault where the collateral was stored was never opened, the source said.

*   *   *

Insurers' involvement was key to the success of Kingold's gold-backed loan deals. The insurance policies provided by leading state-owned insurers like PICC P&C were a major factor defusing lenders' risk concerns, several trust company sources said.

"Without the insurance coverage from PICC P&C, [we] wouldn't issue loans to Kingold as the collateral can only be tested through random picked samples," one person said.

PICC P&C's Hubei branch provided coverage for most of Kingold's loans, Caixin learned. All the policies will expire by October. As of June 11, 60 policies were still valid or involved in lawsuits.

PICC P&C faces multiple lawsuits filed by Kingold's creditors demanding compensation. But a PICC P&C spokesperson said the policies cover only collateral losses caused by accident, disasters, robbery and theft.

Wang Guangming, a lawyer at Dacheng Law Offices, said the key issue is what happened to the pledged gold and which party was aware of the falsification. If Kingold faked the gold bars and both the insurers and creditors were unaware, the insurers should compensate the lenders and sue Kingold for insurance fraud, Wang said. Insurers are also responsible to compensate if they knew of Kingold's scam but creditors didn't, Wang said.

If Kingold and creditors were both aware of the fake collateral, insurers could terminate the policies and sue the parties for fraud. But if insurers were also involved in the scam, then all the contracts are invalid and every party should assume their own legal responsibilities, Wang said.

A financial regulatory official told Caixin that previous investigations of loan fraud cases involving fake gold pledges found there was often collusion between borrowers and financial institutions.

Earlier this year, PICC P&C removed its Hubei branch party head and general manager Liu Fangming. Sources said staff members involved in business with Kingold were also dismissed.

PICC P&C said Liu's removal was due to internal management issues. It didn't answer Caixin's question about whether Liu was involved in the Kingold scandal.

(Emphasis added).

25. On this news, shares of Kingold stock fell $0.27 per share or over 24% to close at $0.85 per share on June 29, 2020.

12

26. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

27. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Kingold securities publicly traded on NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Kingold, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Officer or Director Defendants have or had a controlling interest.

28. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Kingold securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

29. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

30. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

31. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business Kingold;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Defendants caused Kingold to issue false and misleading SEC filings during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and SEC filing
- whether the prices of Kingold securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

32. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

33. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Kingold shares met the requirements for listing, and were listed and actively traded on NASDAQ, a highly efficient and automated market;

- As a public issuer, Kingold filed periodic public reports with the SEC and NASDAQ;

- Kingold regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- Kingold was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

34. Based on the foregoing, the market for Kingold securities promptly digested current information regarding Kingold from all publicly available sources and reflected such information in the prices of the shares, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

35. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

# COUNT I

## For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
## Against All Defendants

36. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

38. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

39. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Kingold securities during the Class Period.

40. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Kingold were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

16

These defendants by virtue of their receipt of information reflecting the true facts of Kingold, their control over, and/or receipt and/or modification of Kingold's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Kingold, participated in the fraudulent scheme alleged herein.

41. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Kingold personnel to members of the investing public, including Plaintiff and the Class.

42. As a result of the foregoing, the market price of Kingold securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Kingold securities during the Class Period in purchasing Kingold securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

43. Had Plaintiff and the other members of the Class been aware that the market price of Kingold securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Kingold securities at the artificially inflated prices that they did, or at all.

44. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

45. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Kingold securities during the Class Period.

### COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

46. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

47. During the Class Period, the Individual Defendants participated in the operation and management of Kingold, and conducted and participated, directly and indirectly, in the conduct of Kingold's business affairs. Because of their senior positions, they knew the adverse non-public information about Kingold's misstatement of revenue and profit and false financial statements.

48. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Kingold's financial condition and results of operations, and to correct promptly any public statements issued by Kingold which had become materially false or misleading.

49. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Kingold disseminated in the marketplace during the Class Period concerning Kingold's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Kingold to engage in the wrongful acts

complained of herein. The Individual Defendants therefore, were "controlling persons" of Kingold within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Kingold securities.

50. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Kingold.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a) declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b) awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 30, 2020                          Respectfully submitted,

                                                            **THE ROSEN LAW FIRM, P.A.**

                                                            /s/Phillip Kim
                                                            Phillip Kim, Esq. (PK 9384)

Laurence M. Rosen, Esq. (LR 5733)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
　　　　lrosen@rosenlegal.com

*Counsel for Plaintiff*